**RUSING LOPEZ LIZARDI & SAFFER, PLLC**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800
Facsimile: (520) 529-4262

Mark D. Lammers
Email: mdlammers@rllsaz.com
State Bar No.: 010335

*Attorneys for Plaintiff Russ Green*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Russ Green, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>Honeywell Aerospace Inc.; James Currier; and Joshua Jepsen,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Russ Green ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Honeywell Aerospace Inc. ("Honeywell Aerospace" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Honeywell Aerospace; and (c) review of other publicly available information concerning Honeywell Aerospace.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of open market purchasers of Honeywell Aerospace common stock between June 29, 2026 and September 1, 2026, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Honeywell Aerospace manufactures and supplies aircraft components, avionics, engines, and systems for various markets. It has three reporting segments: Electronic Solutions, which manufactures integrated cockpits, radars, flight management systems, and precision navigation solutions; Engines and Power Systems, which manufactures and supplies propulsion engines and electric power generation products; and Control Systems, which manufactures and supplies mission critical air, thermal, motion, lighting, friction, and engine control systems.

3. On August 5, 2026, after the market closed, Honeywell Aerospace announced second quarter 2026 earnings, reporting that net income fell 70% year-over-year and adjusted earnings per share declined 32% year-over-year. Further, the Company slashed its full year 2026 guidance, including a reduction in expected year-over-year adjusted EBIT growth from 7%–10% to flat-to-3%.

4. On this news, Honeywell Aerospace's share price fell $47.17 or 23.16%, to close at $156.47 on August 6, 2026, on unusually heavy trading volume.

5. Then, on September 1, 2026 at approximately 2:50 p.m. ET, the Justice Department announced that the Company agreed to "pay over $2 million to settle False Claims Act allegations of failing to comply with cybersecurity requirements in a U.S. Department of Defense contract."

6. On this news, the Company's stock price fell $3.87 per share, or 2.45%, to close at $154.24 per share on September 1, 2026, on unusually heavy trading volume.

7. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that a small percentage of the Company's suppliers had a "disproportionate impact" on sales; (2) that those suppliers were suffering supply constraints; (3) that the foregoing was reasonably likely to have a material unfavorable impact on sales and profitability; (4) that the Company was under investigation for potential violations of the False Claims Act for failing to comply with cybersecurity requirements for government contracts; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

8. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

12. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

13. Plaintiff Russ Green, as set forth in the accompanying certification, incorporated by reference herein, purchased Honeywell Aerospace common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14. Defendant Honeywell Aerospace is incorporated under the laws of Delaware with its principal executive offices located in Phoenix, Arizona. Honeywell Aerospace's common stock currently trades on the NASDAQ Stock Market under the symbol "HONA."

15. Defendant James Currier ("Currier") has been the Company's President and Chief Executive Officer ("CEO") since the spin-off, having been designated to that role in November 2025.

16. Defendant Joshua Jepsen ("Jepsen") has been the Company's Chief Financial Officer ("CFO") since February 2026.

17. Defendants Currier and Jepsen (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports

and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

18. On February 6, 2025, Honeywell International Inc. ("Honeywell International") announced its intent to spin off its aerospace business to "pursue tailored growth strategies, and unlock significant value for shareholders and customers."

19. Honeywell Aerospace registered its shares with the SEC via Form 10 filed on March 3, 2026. The registration statement was declared effective on June 11, 2026, and some Honeywell Aerospace common stock began trading on the NASDAQ under the ticker "HONAV."

20. On June 29, 2026, Honeywell Aerospace completed its spin-off from Honeywell International, and its shares began trading under the ticker "HONA." Honeywell shareholders of record as of June 15, 2026 received one share of Honeywell Aerospace for every two shares of Honeywell.

### Materially False and Misleading Statements

21. On March 3, 2026, the Company filed its Form 10 with the SEC to register its common stock ahead of the spin-off from Honeywell International. Attached as Exhibit 99.1 was Honeywell Aerospace's Information Statement (the "Information Statement"). As to the Company's supply chain, the Information Statement stated as follows in relevant part:

> From 2023 to 2025, we significantly increased our supply chain team and strategically invested more than $1 billion across our supply chain to improve our ability to scale effectively and deliver for our customers. These

> investments – spanning in-sourcing, dual-sourcing, multi-sourcing, and touch and non-touch labor – significantly improved our supply chain resiliency. ***As a result, we achieved 14 consecutive quarters of double-digit factory output growth through December 2025, reinforcing our ability to deliver high-value, mission critical products reliably and at scale.*** We leverage digital connectivity and advanced planning tools, including the integration of AI solutions, to enhance supplier collaboration, procurement efficiency, and aftermarket service. In parallel, ongoing investments in smart factory initiatives and selective automation further strengthen our execution capabilities.

22. The Information Statement further stated the following regarding the Company's suppliers and materials, in relevant part:

> ***Suppliers & Materials***
>
> We source a wide range of raw materials, components, and subsystems from a global network of suppliers to support our manufacturing operations. While most inputs are available from multiple sources at competitive prices, certain components requiring specialized specifications or regulatory qualifications may be sourced from a single supplier or limited number of suppliers. In such cases, we employ risk mitigation strategies including safety stock, dual-sourcing, and qualification of alternative vendors. The aerospace industry's rigorous certification requirements can limit the speed and efficiency of supplier substitution, and external factors such as inflation, geopolitical tensions, and regional conflicts may affect material availability and cost. Over the past several years, we maintained continued delivery performance despite macroeconomic volatility and global supply chain disruptions. Our supply chain maintained resilience through strategic sourcing, digital planning tools, and ongoing investments in supply chain optimization, which enabled us to respond to exogenous shocks.

23. The Information Statement further stated the following regarding the Company's cybersecurity, in relevant part:

> ***Our business operations, reputation, and financial performance may be adversely impacted by cybersecurity attacks or data privacy or information security breaches, as well as changes in cybersecurity and other applicable regulations.***
>
> Our business operations, reputation, and financial performance are highly dependent on the integrity and security of our own and third-party information technology ("IT") infrastructure. ***We also collect, store, and process confidential or sensitive data, including classified information, proprietary business information, and personal data, which is subject to***

***data privacy and security laws, regulations and contractual obligations.*** Cybersecurity is and will continue to be a critical component of our enterprise risk management program.

We face a wide range of global cybersecurity threats and incidents, such as attempts to gain unauthorized access to sensitive information or compromise the integrity, confidentiality, and/or availability of our IT systems; insider threats; ransomware, denial-of-service, and phishing attacks; and cybersecurity failures resulting from human or technological errors. These threats and attacks could be directed at the Company, our products, our customers, and our third-party software and service providers, including attacks on commercial or other aircraft, which could adversely affect our operations, reputation, and financial performance even if such an attack is not targeted at our products, services, or systems. These threats come from a variety of sources, some of which are highly organized and sophisticated nation states and cyber criminals. As a defense contractor and participant in the defense industry, we face increased risk from state-affiliated actors whose interests are adverse to the U.S. and other countries whose defense platforms utilize our products, and this risk grows during times of increased geopolitical conflicts.

We have deployed measures to deter, prevent, detect, respond to, and mitigate these risks (including identity and access controls, data protection, vulnerability assessments, monitoring of our IT networks and systems, and maintenance of backup and protective systems). However, cybersecurity incidents could still occur, and there is no guarantee that our tools and controls will be sufficient to detect, prevent, or mitigate the risk of a cyber-related attack or incident. We face an increased level of risk during significant IT infrastructure transitions, such as those we are undertaking in connection with the separation. These incidents could result in the misappropriation, destruction, corruption, or unavailability of critical data and confidential or proprietary information, theft of funds and disruption of business operations. The evolving nature of cyber threats, including the use of artificial intelligence to craft sophisticated attacks, poses additional challenges in anticipating and preventing such incidents. If we fail to deter, detect or report cybersecurity incidents in a timely manner, we may suffer from financial and other harm, including to our information, operations, performance, employees, and reputation. We cannot be certain that our cybersecurity insurance coverage will be adequate for liabilities actually incurred, that insurance will continue to be available to us on economically reasonable terms, or at all, or that any insurer will not deny coverage as to any future claim.

***Our customers, including the U.S. Government, increasingly require robust cybersecurity protections and standards in our products and***

> ***services, which may result in additional costs to comply with such demands. In addition, cybersecurity and other relevant laws and regulations continue to evolve, including in relation to our processing of personal data or adoption of emerging technologies such as artificial intelligence and machine learning, and the requirements and enforcement of such laws and regulations have also increased, both in the U.S. and globally.***
>
> Changes in these laws add compliance complexity, may increase our and our suppliers' operational and compliance cost and may expose us to reputational damage, litigation, regulatory actions, or fines. Noncompliance with applicable industry standards or legal obligations regarding emerging technologies and data privacy and security could result in costs, fines, litigation, or regulatory actions, and could lead customers to select competitors' products and services, rather than our products and services.

24. The Information Statement purported to warn that the Company "***could***" be subject to enforcement action under the U.S. False Claims Act, stating in relevant part:

> ***As a supplier to the U.S. and international governments, we are subject to unique contracting risks.***
>
> Contracts with the U.S. Government (and with governments in other countries), are subject to termination at its convenience or for our failure to perform consistent with the terms of the applicable contract, either of which could adversely affect our business and financial performance. If a contract is terminated at the U.S. Government's convenience, we generally are entitled to reimbursement for work completed and allowable termination or cancellation costs. If a contract is terminated for default, we generally are entitled to reimbursement for work that has been accepted, but may be subject to U.S. Government claims for the net cost to re-procure the contract items and other damages, which could expose us to liability and adversely affect our ability to compete for future contracts. ***Failure to comply with provisions of our government contracts or other applicable laws and regulations relating to government contracting could lead to civil or criminal enforcement under the U.S. False Claims Act or other statutes and regulations, including potentially significant financial penalties, suspension or debarment from government contracts, which could adversely affect our business, results of operations, financial position, and cash flows.*** In addition, the U.S. Government could terminate a prime contract under which we are a subcontractor, notwithstanding the fact that our performance and the quality of the products or services we delivered were consistent with our contractual obligations. Delays in performance, failure of products, shortages, cost overruns or other failures related to performance of our contracts with the U.S. Government could also impact our reputation, ability to compete, and financial results.

> From time to time, we may begin performance of a U.S. Government contract under an undefinitized contract action with a not-to-exceed price, which is when we begin performing our obligations before the terms, specifications or price are finally agreed to between the parties. The U.S. Government has the ability to unilaterally definitize contracts in the event mutual agreement regarding terms, specifications, or price cannot be reached. If a contract is unilaterally imposed upon us, it may negatively affect our expected profit and cash flows on a program or impose burdensome terms.
>
> U.S Government procurement laws allow legal challenges, also known as bid protests, to the terms of a contract solicitation or the award of a contract. Unsuccessful bidders to programs awarded to us may try to use bid protests to overturn the award to us or seek the award of a subcontract for a portion of the work (in return for withdrawing the bid protest). Bid protests can result in significant expenses, modification of contracts, or even loss of the award, and delay performance of the awarded contract (and associated revenue), which could adversely affect our operating results. We may also protest or challenge bids for contracts that were not awarded to us, and our efforts to do so may be unsuccessful.

25. On June 3, 2026, Honeywell Aerospace held its inaugural Investor Day conference. The PowerPoint presentation accompanying the conference (the "Investor Day Presentation") stated that Honeywell Aerospace had $17.4 billion in net sales, 12% organic sales growth, and $4.3 billion in adjusted EBIT for fiscal 2025. The Investor Day Presentation further stated that the Company "define[s] organic sales growth as the year-over-year change in reported Net sales relative to the comparable period, excluding the impact on sales from foreign currency translation and acquisitions, net of divestitures, for the first 12 months following the transaction date, and other items that are unusual and non-recurring in nature."

26. As to supply chain, the Investor Day Presentation stated that Honeywell Aerospace sourced from more than 3,000 production suppliers and that "Supplier and internal constraints have challenged output." Among other things, these challenges included "Industry-wide shortages of mechanical components impacting multiple downstream supplier tiers" and "Inadequate qualified labor at suppliers," which led to "Delayed output resulting in unconverted backlog." To address this, Honeywell Aerospace

was "[s]tabilizing planning and controlling supplier capacity, driving throughput with integrated execution enabled by Honeywell Aerospace Operating System."

27. During the Investor Day conference, Honeywell Aerospace provided fiscal 2026 outlook, expecting "7-9%" organic growth and "$4.65-$4.75B" adjusted EBIT on a pro forma, standalone basis (i.e. as an independent company following the spin-off). Defendant Jepsen explained that the Company's "2026 outlook is underpinned by our ability to deliver on robust customer demand through our supply chain and manufacturing footprint." Specifically, Defendant Jepsen stated as follows, in relevant part:

> On a pro forma stand-alone basis, we're expecting organic sales growth of 7% to 9% and adjusted EBIT of $4.65 billion to $4.75 billion. On a stand-alone basis, as we spin, we expect free cash flow in the second half of 2026 to be $1 billion to $1.5 billion. The midpoint of that range is a good run rate as a base for future growth.
>
> This allows us, as a stand-alone entity, to take the actions required to set us up to both execute for the long term and reduce seasonality of cash flows to be more consistent throughout the year. With tailwinds in all 3 of our end markets, this 2026 outlook is underpinned by our ability to deliver on robust customer demand through our supply chain and manufacturing footprint. On the OE side, production rates are improving, and our large backlog provides high visibility into our high single-digit outlook, supporting our high single-digit outlook.

28. On June 29, 2026, *The Wall Street Journal* published an article entitled "Honeywell Aerospace CEO Says AI Works for Blueprints but Isn't Ready for the Cockpit." The article contained "edited excerpts" of the *Journal*'s conversation with Defendant Currier "about tackling the supply chain, navigating Pentagon demands and where artificial intelligence fits in the conversation." In relevant part, the interviewer asked: "Supple-chain snags have hurt production since Covid-19. Are these problems avoidable, or the nature of the aerospace business today?" Defendant Currier responded:

> Unfortunately, it is a part of the nature today. However, the amount of investment that we've made over the last three years is in excess of a billion dollars, both within our own factories and down into the supply base. ***What we've got is some acute issues within the industry,*** and typically you see those in castings and forgings and machine shot operations. ***They also represent tremendous opportunities for us.***

29. The above statements in ¶¶ 21-28 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that a small percentage of the Company's suppliers had a "disproportionate impact" on sales; (2) that those suppliers were suffering supply constraints; (3) that the foregoing was reasonably likely to have a material unfavorable impact on sales and profitability; (4) that the Company was under investigation for potential violations of the False Claims Act for failing to comply with cybersecurity requirements for government contracts; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

30. The truth began to emerge on August 5, 2026, after the market closed, when Honeywell Aerospace announced second quarter 2026 earnings, reporting that net income fell 70% year-over-year and adjusted earnings per share declined 32% year-over-year. Honeywell reported net income of $256 million, well below consensus estimates expecting $684 million. Further, the Company slashed its full year 2026 guidance, now expecting flat to 3% in adjusted EBIT growth and 4% to 5% organic growth.

31. The same day, the Company held a conference call to discuss the financial results with analysts and investors (the "2Q26 Earnings Call"). During the 2Q26 Earnings Call, Defendant Currier admitted "[o]ur supply base has not been able to ramp in the manner we were expecting earlier this year." He stated, in relevant part:

> Orders increased by 8% over the past year, and we recently secured the largest selectable win in company history, bringing the lifetime value of year-to-date customer wins to $15 billion.
>
> Against this backdrop of increasing demand, however, our supply base has not been able to ramp in the manner we were expecting earlier this year. After a few years of double-digit output growth, ***we faced supply chain constraints in the first quarter that resulted in factory volume growth below expectations***. At the time, we guided you to expect a steady ramp in our output through the first half, accelerating into the back half. While we are seeing progress, the ramp has not come through at the pace we had initially

> laid out. Frankly, ***I underestimated how long it would take to implement and see traction from the corrective measures we had taken and are taking.***
>
> Importantly, the issues remain contained to a handful of material and supplier bottlenecks. Critical and constrained suppliers represent roughly 2% of our supply base and the vast majority of our thousands of suppliers are delivering as expected.

32. During the 2Q26 Earnings Call, Defendant Currier further explained the mix of its suppliers as follows:

> We have over 3,000 suppliers that support Honeywell Aerospace. 98% of them are performing exceptionally well. . . . ***This remaining 2%, I would categorize them as follows: into 2 very distinct categories. There are those that are constrained, those that simply are not providing the output that we need but that represents literally a handful of suppliers. The balance, I would call them critical.*** These are those suppliers that have yet to demonstrate a level of robustness and consistency that is aligned to my expectations. So we enhance our surveillance and engagement with them as well as a result. But I'll tell you, with the strategic actions we have underway, we are creating that foundation of greater visibility and improved performance in 2027 and beyond, Sean.

33. During the 2Q26 Earnings Call, Defendant Currier also revealed that constrained suppliers could have a "disproportionate impact" on Honeywell Aerospace's revenue, stating in relevant part:

> I'll kind of conceptualize and put some texture around this a little bit. As one of these key suppliers that is constrained for us, one of those categories that I described a moment ago, the past due of this particular supplier is roughly $15 million, $16 million. And you would think that's not a significant amount of past due on a business that's $18 billion in revenue, the size of Honeywell Aerospace.
>
> But the reality is that one component coming from this one supplier at being about $15 million of past due actually unlocks hundreds of millions of dollars of revenue output for Honeywell Aerospace. So it is disproportionate. And so even though it's a small group, of constrained suppliers, they have a very disproportionate impact on our output volume growth going forward, and that's where we're hyper focused with the team spending personal time.

34. On this news, shares of Honeywell Aerospace fell $47.17 or 23.16%, to close at $156.47 on August 6, 2026, on unusually heavy trading volume.

35. Also on August 5, 2026, after the market closed, the Company filed its quarterly report for second quarter 2026 on a Form 10-Q with the SEC, affirming the previously reported financial results. As to legal proceedings, the report stated, in relevant part:

> ***Other Matters***
>
> The Company is subject to a number of other lawsuits, investigations, and claims (some of which involve large dollar amounts) arising out of the conduct of its business operations, including matters relating to commercial transactions, the integration of emerging technologies (such as, but not limited to, artificial intelligence and machine learning), employment, intellectual property, legal, and environmental, health, and safety matters. The Company recognizes liabilities for any contingency that is probable of occurrence and reasonably estimable. The Company routinely assesses the likelihood of adverse judgments or outcomes in such matters, as well as potential ranges of probable losses (taking into consideration the likelihood of any insurance recoveries), based on a careful analysis of each matter, and if appropriate, with the assistance of outside legal counsel and other experts.
>
> Given the uncertainty inherent in litigation and investigations, the Company cannot predict when or how these matters will be resolved and does not believe it is possible to develop estimates of reasonably possible losses (or a range of possible losses) in excess of current accruals for commitment and contingency matters. Considering the Company's past experience and existing accruals as of the date of these financial statements, the Company does not expect the outcome of such matters, either individually or in the aggregate, to have a material adverse effect on the Company's combined financial position. Because most contingencies are resolved over long periods of time, potential liabilities are subject to change due to new developments (including new discovery of facts, changes in legislation, and outcomes of similar cases through the judicial system) or changes in assumptions or changes in settlement strategy or the impact of evidentiary requirements, any of which could cause or require the Company to pay damage awards or settlements (or become subject to equitable remedies) that could have a material adverse effect on the Company's combined results of operations or operating cash flows in the periods recognized or paid.

36. The above statements in ¶¶ 30-33, 35 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company was under investigation for potential violations of the False Claims Act for

failing to comply with cybersecurity requirements for government contracts; and (2) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**Disclosures at the End of the Class Period**

37. Then, on September 1, 2026 at approximately 2:50 p.m. ET, the Justice Department announced that the Company agreed to "pay over $2 million to settle False Claims Act allegations of failing to comply with cybersecurity requirements in a U.S. Department of Defense contract." (capitalization modified). The press release stated, in relevant part:

> The Justice Department announced today that Honeywell Aerospace Inc. has agreed to pay $2,042,518 to resolve allegations that it is liable under the False Claims Act for failing to comply with cybersecurity requirements in a contract with the U.S. Department of Defense. Honeywell Aerospace, a corporation headquartered in Phoenix, Arizona, provides aerospace products and solutions to government and commercial customers. Prior to June 29, when Honeywell Aerospace became a standalone public company, it was a business segment of Honeywell International Inc., of Charlotte, North Carolina.
>
> "Government contractors that obtain defense information in administering their contracts must follow required cybersecurity standards," said Assistant Attorney General Brett A. Shumate of the Justice Department's Civil Division. "The Justice Department will continue to investigate potential violations of these cybersecurity requirements to protect this critical information."
>
> "Cybersecurity requirements and standards for federal contractors are in place for a reason: to protect government systems and prevent unauthorized access to government data," said U.S. Attorney Russ Ferguson for the Western District of North Carolina. "Companies that seek and profit off of government contracts have an obligation to ensure sensitive data is protected."
>
> The settlement resolves allegations that from April 2020 through December 2023, a business unit of Honeywell International Inc. submitted false claims for payment by failing to comply with cybersecurity requirements specified in National Institute of Standards and Technology (NIST) Special Publication (SP) 800-171, with respect to one of Honeywell's networks, as required by the contract and regulation.

38. On this news, the Company's stock price fell $3.87 per share, or 2.45%, to close at $154.24 per share on September 1, 2026, on unusually heavy trading volume.

**CLASS ACTION ALLEGATIONS**

39. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities who purchased or otherwise acquired Honeywell Aerospace common stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

40. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Honeywell Aerospace's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Honeywell Aerospace shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Honeywell Aerospace or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

42. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

43. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Honeywell Aerospace; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

44. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

45. The market for Honeywell Aerospace's common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Honeywell Aerospace's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased Honeywell Aerospace's common stock relying upon the integrity of the market price of the Company's common stock and market information relating to Honeywell Aerospace, and have been damaged thereby.

46. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Honeywell Aerospace's common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Honeywell Aerospace's business, operations, and prospects as alleged herein.

47. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Honeywell Aerospace's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

48. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

49. During the Class Period, Plaintiff and the Class purchased Honeywell Aerospace's common stock at artificially inflated prices and were damaged thereby. The price of the Company's common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

50. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information

reflecting the true facts regarding Honeywell Aerospace, their control over, and/or receipt and/or modification of Honeywell Aerospace's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Honeywell Aerospace, participated in the fraudulent scheme alleged herein.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**

**(FRAUD-ON-THE-MARKET DOCTRINE)**

51. The market for Honeywell Aerospace's common stock was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Honeywell Aerospace's common stock traded at artificially inflated prices during the Class Period. On July 2, 2026, the Company's share price closed at a Class Period high of $247.15 per share. Plaintiff and other members of the Class purchased the Company's common stock relying upon the integrity of the market price of Honeywell Aerospace's common stock and market information relating to Honeywell Aerospace, and have been damaged thereby.

52. During the Class Period, the artificial inflation of Honeywell Aerospace's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Honeywell Aerospace's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Honeywell Aerospace and its business, operations, and prospects, thus causing the price of the Company's common stock to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at such artificially inflated prices, and each of them has been damaged as a result.

53. At all relevant times, the market for Honeywell Aerospace's common stock was an efficient market for the following reasons, among others:

(a) Honeywell Aerospace shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Honeywell Aerospace filed periodic public reports with the SEC and/or the NASDAQ;

(c) Honeywell Aerospace regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Honeywell Aerospace was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

54. As a result of the foregoing, the market for Honeywell Aerospace's common stock promptly digested current information regarding Honeywell Aerospace from all publicly available sources and reflected such information in Honeywell Aerospace's share price. Under these circumstances, all purchasers of Honeywell Aerospace's common stock during the Class Period suffered similar injury through their purchase of Honeywell Aerospace's common stock at artificially inflated prices and a presumption of reliance applies.

55. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive

proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**NO SAFE HARBOR**

56. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Honeywell Aerospace who knew that the statement was false when made.

**FIRST CLAIM**

**Violation of Section 10(b) of The Exchange Act and**

**Rule 10b-5 Promulgated Thereunder**

**Against All Defendants**

57. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

58. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii)

cause Plaintiff and other members of the Class to purchase Honeywell Aerospace's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

59. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Honeywell Aerospace's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

60. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Honeywell Aerospace's financial well-being and prospects, as specified herein.

61. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Honeywell Aerospace's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Honeywell Aerospace and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

62. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level

executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

63. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Honeywell Aerospace's financial well-being and prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

64. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Honeywell Aerospace's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by

Defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class purchased Honeywell Aerospace's common stock during the Class Period at artificially high prices and were damaged thereby.

65. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Honeywell Aerospace was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased their Honeywell Aerospace common stock, or, if they had purchased such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

66. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**<u>SECOND CLAIM</u>**

**Violation of Section 20(a) of The Exchange Act**

**<u>Against the Individual Defendants</u>**

68. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

69. The Individual Defendants acted as controlling persons of Honeywell Aerospace within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing

public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

70. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

71. As set forth above, Honeywell Aerospace and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: September 22, 2026

**RUSING LOPEZ LIZARDI & SAFFER, PLLC**

By: */s/ Mark D. Lammers*
Mark D. Lammers
State Bar No. 010335
6363 North Swan Road, Suite 151
Tucson, AZ 85718
Telephone: (520) 792-4800
Facsimile: (520) 529-4262
Email: mdlammers@rllsaz.com

**GLANCY PRONGAY WOLKE & ROTTER LLP**
Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
clinehan@glancylaw.com
prajesh@glancylaw.com

Rebecca Dawson
745 5th Avenue, 5th Floor
New York, NY 10151
Telephone: (213) 521-8007
Facsimile: (212) 884-0988
Email: rdawson@glancylaw.com

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Attorneys for Plaintiff Russ Green*